UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KLAY MAGYAR,

    Plaintiff,

vs.   Case No. 18-13447

UNITED STATES POSTAL SERVICE, et al.,   HON. AVERN COHN

    Defendants.
_____/

# MEMORANDUM AND ORDER
# GRANTING DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT
# (Doc. 12)

## I. Introduction

This is an employment case. As will be explained, plaintiff Klay Magyar (Magyar), a long time letter carrier for the United States Post Office, voluntarily retired when faced with termination. He and his wife, Linda Magyar, also sued, naming the following defendants:

- the United States Postal Service

- Postmaster Megan J. Brennan, in her official capacity,

- Adrana Jones, Postmaster of the Southfield, Michigan post office, in her official capacity,

- Lashiba Tarrance, Supervisor Customer Services for the Southfield, Michigan post office, in her official capacity,

- the National Association of Letter Carriers ("NALC" or "the union")

- Carl Blassingame, a union representative

- John Dickerson, a union representative

The complaint asserts the following claims:

- Count I - violation of Title VII (race discrimination, sex discrimination, age

>           discrimination, and retaliation)

- Count II - violation of 42 U.S.C. § 1983 (due process)

- Count III - violation of 42 U.S.C. § 1985(3) and § 1986 (conspiracy)

- Count IV - civil conspiracy

- Count V - violation of Michigan's Elliot Larsen Civil Rights Act

- Count VI - loss of consortium

Following a stipulation[1] and based on concessions in Magyar's response brief, the only claim at issue is Count I - Magyar's Title VII claim against the United States Postal Service (USPS) and Post Master General Megan J. Brennan in her official capacity.[2] [3] Magyar claims discrimination based on his race (Caucasian), sex (male), age,[4] and retaliation.

---

[1] See Doc. 21 - stipulated order dismissing the union and the union representatives.

[2] Magyar's suit against the United States Postal Service and the Postmaster General in her official capacity is essentially a lawsuit against only the United States Postal Service. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71(1989).

[3] To the extent Magyar seeks leave to amend the complaint to assert a Bivens claim against Adrana Jones and Lashiba Tarrance in their individual capacities, leave is denied because such a claim is futile. The Court of Appeals for the Sixth Circuit has clearly held that "[i]n the field of federal employment, ... courts will not create a Bivens remedy." Jones v. Tennessee Valley Auth., 948 F.2d 258, 264 (6th Cir. 1991); see also Downie v. City of Middleburg Heights, 301 F.3d 688, 694-95 (6th Cir. 2002) (Bivens claim unavailable in claims arising from federal employment); Mitchell v. Chapman, 343 F.3d 811, 825 (6th Cir. 2003) ("it is well-settled that [postal employees] employees may not allege Bivens claims arising out of their employment relationship with the [post office].")

[4] Title VII does not cover age discrimination claims. Rather, the Age Discrimination in Employment Act (ADEA) prohibits an employer from discriminating against an individual because of that individual's age. 29 U.S.C. § 623(a)(1). Magyar did not bring a claim under the ADEA nor does either party discuss an age based claim. As such, the Court finds that Magyar has not brought a proper age discrimination claim.

Before the Court is the USPS's motion to dismiss or for summary judgment on Magyar's Title VII claim. For the reasons that follow, the Court will consider the motion as a motion to dismiss and the motion will be granted.[5]

## II. Background

The following facts are gleaned from the record as follows:[6]

### A. General/November 4, 2015 Incident

Magyar was employed as a full-time mail carrier by the USPS at the Southfield Post Office in Southfield, Michigan. He began working for the USPS in 1981.

The events which led to this lawsuit began on November 4, 2015. On that day, USPS supervisor Karen Chan (Chan) attempted to conduct a route evaluation of Magyar's mail route, known as a "3999 evaluation" or a "3999." According to Chan, the evaluation was prompted by Magyar's complaints that his route was too long which resulted in him getting paid approximately $5000.00 in overtime per year. Magyar admits that he earned the overtime and says "he had a job assignment which was coveted by

---

[5] Also before the Court is Magyar's Motion to Correct Three Statements Contained in his Response Brief. (Doc. 24). The motion is GRANTED.

[6] When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b) a court is generally permitted to consider documents attached to a motion to dismiss. Weiner v. Klais and Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997). A court can also consider documents beyond those attached to a motion to dismiss, "in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). This includes documents that form part of the case's record. 5B Wright & Miller § 1357 (3d ed.). These documents may be considered without converting a motion to dismiss to a motion under Federal Rule of Civil Procedure 56. Here, the USPS and Magyar attached documents gathered during the internal investigation and EEOC investigation of the incident which led to the decision to terminate Magyar as well as documents from the administrative appeal process. The Court finds these documents appropriate for consideration on deciding whether Magyar's Title VII claim is plausibly plead. Additionally, Magyar has not argued that discovery is necessary and has instead responded substantively to the motion.

3

other employees." Doc. 19 - Magyar's response brief at p. 9.

Chan reported that Magyar was hostile toward her upon her arrival, made racially derogatory comments about other postal employees to her, and initially refused to permit the inspection. This resulted in a meeting with Magyar and Chan and two union stewards to discuss the situation. Eventually, Magyar agreed to the inspection which required Chan to accompany him on his route. Chan reported that Magyar hit her with a parcel while he was in the process of loading his mail truck, hit her in the knee with a mail tub while she was sitting in the vehicle, and then – when Chan attempted to stop the inspection before they even left the facility – Magyar initially refused to let her leave the truck before eventually relenting.

Chan reported the incident to the Southfield postmaster that day and provided a statement documenting the events. Afterwards, the Southfield postmaster, Adrana Jones (Jones), an African-American, told Magyar to leave his post and go home. Magyar states he was not given an explanation for why he was told to leave.

### B. USPS/Union Investigation

On November 4, 2015, Magyar filed a Step A union grievance related to being told to go home.

On November 6, 2015, Jones reported the incident relayed by Chan to USPS Inspectors.

On November 6, 2015, Magyar received a certified letter dated November 4, 2015 signed by Jones and Lashiba Tarrance (Tarrance), Magyar's supervisor and also African-American, which states in relevant part:

> This is an official written notice that you are verbally put on Emergency Placement on November 4, 2015, in accordance with Article 16.7 of the National Agreement.

4

You will continue off duty (without pay) status until you are advised otherwise.

The reason(s) for this action are: INJURIOUS TO SELF OR OTHERS

BASED ON YOUR BEHAVIOR ON NOVEMBER 4, 2015, THERE IS REASON TO BELIEVE THAT RETAINING YOUR ON DUTY MAY RESULT IN INJURY TO YOURSELF OR OTHERS. ACCORDINGLY, YOUR RETENTION IS A DUTY STATUS WOULD NOT BE WITHIN THE BEST INTEREST OF THE POSTAL SERVICE.

On November 16, 2015, Magyar received a telephone call from a manager at the Southfield post office stating he was to return to work on November 20, 2015 and would be required to attend an investigative interview.

On November 20, 2015, Magyar reported but was told by a union steward to go home because the interview was cancelled.

On November 20, 2015, an Investigative Postal Inspector sent an Investigative Memorandum to Jones regarding the November 4, 2015 incident. The memoradum reveals that the postal inspectors interviewed Chan on November 9, 2015, Magyar on November 13, 2015 (at a union hall), and postal carrier Nannette Barclay, a witness, on November 13, 2015. The inspector objectively documented the interviews but did not make any findings of fault or make any recommendations.

Magyar returned to work on December 1, 2015 and participated in an investigative interview during which Magyar generally denied Chan's version of the events.

On December 10, 2015, Magyar participated in a mediation with Jones but no agreement was reached.

On December 11, 2015, Carl Blassingame, a union steward and former defendant, told Magyar that he would be paid for the period he was suspended from November 20 through November 30. This agreement was memorialized in a partial settlement of grievance number NALC-SF15-23 USPS, dated December 17, 2015. It

5

was signed by Jones as the USPS designee and Blassingame, as the union designee. A final settlement of the grievance, dated February 22, 2016, and signed by the same parties, also required that the Emergency Placement suspension notice be expunged from Magyar's file.

On January 13, 2016, Tarrance issued a Notice of Removal (Non-Veteran) to Magyar which is dated January 12, 2016. The Notice of Removal states that Magyar would be terminated effective February 19, 2016. It also informed Magyar that he had the right to file a union grievance contesting his removal and if he filed a grievance, his termination would be deferred pending the outcome of the grievance process. Magyar received the notice but refused to sign it. The Notice of Removal also states that Magyar had failed to provide an acceptable explanation for his conduct on November 4, 2015 when he was interviewed by the postal inspectors on December 1, 2015. The notice also pointed to several sections of the Labor Relations Manual and the City Delivery Carriers Duties and Responsibilities that Magyar's conduct on November 4, 2015, had violated.

The same day he received the Notice of Removal, Magyar did two things. First, he filed a grievance related to the Notice of Removal. Second, he began the online administrative process to retire from the USPS. Magyar completed the administrative process and retired from the USPS effective February 1, 2016.

On February 22, 2016, the union and USPS settled Magyar's second grievance, grievance number NALC SF16-03 USPS, related to the Notice of Removal. The terms of the settlement read as follows: "The Notice of Removal dated 1/12/2016, will be rescinded and expunge [sic] from all files based on the above grievant retiring from the

6

Postal Service with the effective date of 2/1/2016. This resolves all complaints concerning the Notice of removal." The settlement was signed by Jones as the USPS designee, and Blassingame, as the union designee.

## C. EEOC Investigation

Meanwhile, while the USPS/Union investigation was ongoing, Magyar contacted the EEOC office on November 4, 2015, after he was suspended.

In a signed "Information for Pre-Complaint Counseling" EEOC form, dated November 13, 2015, and received November 16, 2015, Magyar asserted that he was suspended on November 4, 2015 for discrimination related to age and gender, and retaliation for prior EEOC activity. He acknowledged that he had filed a union grievance on the same issue on November 4, 2015. There is no charge of racial discrimination in this document.

Throughout the EEOC process, Magyar accused Tarrance and Jones specifically of discriminating against him, given that they had issued the initial suspension and the Notice of Removal.

In a second "Information for Pre-Complaint Counseling" EEOC form, dated January 2, 2016, and received January 19, 2016, Magyar made similar allegations of discrimination and retaliation related to various negative comments he alleged USPS staff and management had made to him since the November 4, 2015, suspension. The second document added a charge of racial discrimination.

In the signed investigatory affidavit dated February 2, 2016, the day after he retired, Magyar again asserted that he was suspended on November 4, 2015, based on his race, sex, age, and retaliation for prior EEOC activity. Magyar additionally protested

7

the Notice of Removal as discriminatory. He again also acknowledged that he had filed a union grievance on the same matter. Magyar's February 2, 2016, affidavit does not ask for his job to be restored. In answer to the question, "What remedy do you request to resolve this complaint?" he wrote "I want to be made whole, to include but, not limited to, pay, leave, and all benefits."

At no point either before or after the EEOC process did Magyar either attempt to, or request to, rescind his retirement. In her Investigative Affidavit to the EEOC, dated March 7, 2016, Jones informed the EEOC that Magyar had settled the grievance related to the EEOC claim. Jones also provided the EEOC with a copy of the settlement.

Magyar testified to the EEOC that he filed grievances of both his suspension and the Notice of Removal. Magyar acknowledged that the grievance regarding the suspension was settled, but claimed he did not know the status of the grievance related to the Notice of Removal.

The EEOC issued a Final Agency Decision on Magyar's claims on September 5, 2018. The decision included both grievance settlements in the record. The Final Agency Decision considered two claims: (1) that Magyar's emergency placement suspension on November 4, 2015, was the result of discrimination based on race, sex, age, and retaliation; and (2) that the Notice of Removal issued on January 12, 2016, was the result of discrimination based on race, sex, age, and retaliation. The decision noted that an additional allegation, related to the various negative comments he alleged USPS staff and management had made to him was dismissed for failure to state a claim on January 26, 2016. The Final Agency Decision concluded that Magyar had failed to make sufficient factual allegations to establish prima facie claims of discrimination based on

race, sex, age, and retaliation in relation to either his suspension or the Notice of Removal. Most notably, the Final Agency Decision found that Magyar had not identified a similarly situated non-Caucasian who was treated more favorably. The Final Agency Decision also found that USPS had articulated legitimate, nondiscriminatory reasons for both the suspension and issuing the Notice of Removal. Finally, the Final Agency Decision held that Magyar was unable to prove that USPS's legitimate reasons for issuing the suspension and Notice of Removal were pretext for discrimination.

### D. Lawsuit

Two months after the Final Agency Decision issued and over two years after Magyar retired, on November 4, 2018, Magyar and his wife filed this action asserting the claims against various defendants set forth above.

### III. Legal Standard

In assessing a Rule 12(b)(6) motion, the district court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true. Ziegler v. IBP Hog Mkt., Inc., 249 F.3d 509, 512 (6th Cir. 2001). The factual allegations of the complaint must be enough to raise a right to relief above the speculative level. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Further, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." Id.

"In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), th[e] Court may only consider 'the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the [Court] may take judicial notice.'" Murray v. Geithner, 624 F. Supp. 2d 667, 671 (E.D. Mich. 2009).

## IV. Discussion

### A. Title VII

Title VII of the Civil Rights Act makes it illegal for any employer to discharge any individual because of that person's sex or race or age. 42 U.S.C. § 2000e-2. A plaintiff may prove a violation of Title VII through direct or indirect evidence. See Johnson v. Kroger Co., 319 F.3d 858, 865–66 (6th Cir. 2003). "[T]o compensate for the fact that direct evidence of intentional discrimination is hard to come by," the Supreme Court has articulated a test for evaluating indirect evidence of Title VII violations. Price Waterhouse v. Hopkins, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring). Under the McDonnell Douglas framework, a plaintiff may make a prima facie case of discrimination through indirect evidence by first showing that: (1) he is a member of a protected group; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected class or treated differently from similarly-situated members of an unprotected class. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

### A. Prima Facie Case

#### 1. Similarly Situated

Although not raised by USPS, it appears that Magyar has not made out a prima facie case for discrimination because he has not alleged that a similarly situated non-Caucasian was treated differently. To establish the "similarly situated" element, Magyar must compare his treatment with individuals who "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or

the employer's treatment of them for it.  Jackson v. FedEx Corporate Servs., Inc., 518 F.3d 388, 393 (6th Cir. 2008).

Here, the complaint simply alleges that if Magyar was "an African-American male he would not have been treated in the manner described" but does not identify any similarly situated postal employee who was treated more favorably after engaging in similar conduct.  Indeed, the Final Agency Decision in the EEOC process concluded that Magyar's discrimination claims failed because he did not identify a valid comparable.  Before the EEOC, Magyar asserted that Tarrance, an African-American female and his supervisor, was engaged in similar conduct and was not given an automatic suspension.  However, the Final Agency Decision concluded that Tarrance was not similarly situated.  Putting aside she is a manager, the record failed to show that Tarrance engaged in the same aggressive conduct as Magyar, including refusing to let another postal employee leave the postal vehicle.  The Court likewise concludes that Magyar's prima facie case fails for failure to plausibly put forth a similarly situated non-Caucasian was treated better than Magyar after engaging in the same conduct.

2.  Adverse Employment Action

USPS argues that because Magyar voluntarily retired before he was terminated, he has not suffered an adverse employment action.  The Court agrees.  "An adverse employment action is a 'materially adverse change in the terms and conditions of employment,' such as termination, a demotion accompanied by a salary decrease, or a material loss of benefits or responsibilities.  Borum v. Illinois Cent. R. Co., 610 F. App'x 472, 474 (6th Cir. 2015) (quoting Bowman v. Shawnee State Univ., 220 F.3d 456, 461–62 (6th Cir. 2000)).  "De minimis employment actions, such as 'temporary actions or

11

where further remedial action is moot and no economic loss occurred,' do not qualify." Borum, 610 F. App'x at 474 quoting Bowman, 220 F.3d at 462. Formal criticisms or reprimands that are not accompanied by additional disciplinary action such as a negative change in grade, salary or other benefits, do not constitute adverse employment actions. Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1058 (8th Cir. 2007).

"[A] retirement request initiated by an employee is presumed to be a voluntary act[.]" Keyes v. D.C., 372 F.3d 434, 439 (D.C. Cir. 2004) (quoting Schultz v. U.S. Navy, 810 F.2d 1133, 1135 (Fed. Cir. 1987)); see also Aliotta v. Bair, 614 F.3d 556, 566 (D.C. Cir. 2010) ("[R]esignations or retirements are presumed to be voluntary…" unless an employee can show that "a reasonable person in the employee's position would have felt compelled to resign under the circumstances.")  "The 'voluntariness' question ... turns on things such as: did the person receive information about what would happen in response to the choice? [W]as the choice free from fraud or other misconduct? [D]id the person have an opportunity to say no?"  Id. at 566–67.

Here, Magyar alleges that he was discriminated and retaliated against because he was suspended without pay and issued a Notice of Removal. The record clearly shows, however that the USPS quickly settled union grievances on these issues by (1) restoring Magyar's pay for the suspension period,[7] (2) expunging the suspension from his record

---

[7]To the extent Magyar asserts that he did not receive pay due to him from the suspension, his action would be to enforce the settlement agreement he reached during the grievance process.  The Court would not have jurisdiction over that suit. Congress has waived sovereign immunity in Title VII suits, but that waiver does not extend to claims against the government "for breach of a settlement agreement that resolves a Title VII dispute." Lindstrom v. United States, 510 F.3d 1191, 1195 (10th Cir. 2007). See also Taylor v. Geithner, 703 F.3d 328, 33 (6th Cir. 2013) (Title VII waiver did not apply to claims for breach of a settlement agreement).  The Postal Reorganization Act provides that USPS employee-management relations are governed by Subchapter II of Chapter 7 of the Labor Management Relations Act, 29 U.S.C. 151, et seq., with limited exceptions.

12

and (3) revoking the Notice of Termination, both of which are favorable to Magyar. Moreover, Magyar began the retirement process the day he received the Notice of Removal. He picked his retirement date: February 1, 2016. His decision to retire mooted the Notice of Removal because Magyar retired before the process could proceed. Even so, the USPS removed the Notice of Removal from Magyar's record, thus providing him with a clean record.

Under these undisputed facts in the record, Magyar cannot meet the adverse employment action threshold as a matter of law because he suffered no economic harm due to the suspension and made the voluntary choice to retire.

Even if the suspension and Notice of Removal could be viewed as adverse employment actions, the Sixth Circuit has held that "[w]hen an otherwise adverse employment action is rescinded before the employee suffers a tangible harm, the employee has not suffered an adverse employment action." Borum, 610 F. App'x at 475, (quoting Keeton v. Flying J, Inc., 429 F.3d 259, 263 (6th Cir. 2005)). Thus, the fact that the suspension was removed during the grievance process and the Notice of Removal was never acted upon due to Magyar's voluntary retirement, he cannot plausibly make out a claim for discrimination under Title VII.

In response, Magyar contends that his retirement was not voluntary, and instead says he was subjected to a constructive discharge. The problem for Magyar is that he never pursued a constructive discharge claim during the EEOC process and the

---

When a collective bargaining agreement establishes a grievance procedure and grants the union the right to pursue claims on behalf of an employee, the results are normally conclusive of the employee's rights and subject to limited review. DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 163–64 (1983). As such, an employee cannot independently attack the results of the grievance process.

complaint does not plead a theory of constructive discharge. Title VII requires that a plaintiff exhaust his administrative remedies prior to bringing suit in federal court by filing a charge of discrimination with the EEOC within 300 hundred days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1); see also Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 731 (6th Cir. 2006). Unless a plaintiff clearly filed the claim in an EEOC charge or the claim "can reasonably be expected to grow our of the EEOC's investigation of the charge," federal courts do not have subject matter jurisdiction to hear a Title VII claim. Seay v. Tennessee Valley Auth., 340 F. Supp. 2d 844, 848 (E.D. Tenn. 2004). The scope of investigation doctrine provides that a federal court action "must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." Tisdale v. Fed. Express Corp., 415 F.3d 516, 527 (6th Cir. 2005) quoting Ang v. Procter & Gamble Co., 932 F.2d 540, 545 (6th Cir. 1991). "Absent a specific amendment of the charge to include a constructive discharge claim, or extensive factual allegations concerning intolerable working conditions which clearly point to the unnamed legal conclusion that a constructive discharge has occurred, or evidence as to the actual scope of the EEOC investigation or the subject of conciliation attempts, ... a claim of constructive discharge to be outside the scope" of an EEOC discrimination investigation." Cedar v. Premier Industrial Corp., 869 F.2d 1489, (6th Cir. 1989) (table).

Even assuming Magyar was able to assert a constructive discharge claim, it would be futile. "[A]n employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged. Instead, the employee is obliged 'not to assume the worst, and not to jump to conclusions too fast.'" Johnson v. Rumsfeld, 238

F. App'x 105, 109 (6th Cir. 2007) (quoting Agnew v. BASF Corp., 286 F.3d 307 (6th Cir. 2002)). Magyar has made no allegation – either in the EEOC action or this suit – that USPS asked him to retire, encouraged him to retire, or engaged in fraud or other misconduct that affected his resignation decision, let alone left him with no alternative but to accept resignation. To the contrary, the record shows that USPS restored his pay during the suspension period when he grieved the issue and removed the Notice of Removal from his file. The USPS's actions in the grievance process and Magyar's decision to retire cured any adversity between the parties and precludes a discrimination claim based on the Notice of Removal.

V. Conclusion

Overall, Magyar cannot show any adverse employment action, a necessary element to establish a plausible prima facie case for any Title VII retaliation or discrimination claim as plead in Count I. USPS's motion is GRANTED. This case is DISMISSED.

SO ORDERED.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: 5/6/2019
   Detroit, Michigan